UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONALD HAYES ALBEE,

        Plaintiff,

   v.

CONTINENTAL TIRE NORTH AMERICA, INC., An Ohio Corporation, and FORD1 MOTOR COMPANY, INC., a Delaware Corporation,

        Defendants.

NO. CIV. S-09-1145 LKK/EFB

O R D E R

Plaintiff alleges that he was driving a 2002 Ford Explorer when the left rear tire catastrophically malfunctioned as a result of a tread and/or belt separation. The Explorer lost control and rolled over, resulting in severe injuries to Plaintiff. The vehicle was designed and manufactured by defendant Ford Motor Co., Inc., and the tire was designed manufactured by defendant Continental Tire North America, Inc. ("Ford" and "Continental," respectively). Plaintiff brings claims against both for strict liability and negligence in the design and manufacture of these

1

products.[1]

The case is presently before the court on a motion for reconsideration of a discovery order entered by the magistrate judge assigned to this case. Continental seeks reconsideration of the March 18, 2010 order (Dkt. No. 91) insofar as it granted in part plaintiff's motions to compel (Dkt. Nos. 41, 63, 66, 67) and concomitantly denied in part Continental's motion for a protective order (Dkt. No. 69). The court heard argument on the matter on April 26, 2010. For the reasons stated below, Continental's request for reconsideration is denied.

**I. Background**

**A.   Factual Background**

The complaint alleges that Ford designed and manufactured the 2002 Ford Explorer that plaintiff was operating at the time of the accident and that Continental designed and manufactured the General Ameritrac SUV 235/70R16 tire that suffered a tread and/or belt separation that was a cause of the subject accident.

Plaintiff alleges that the tire suffered a number of specific design and manufacturing defects which caused the accident. Compl. ¶¶ 10-11. The design defects include "inadequately sized or improperly engineered belt wedges," "the utilization of tread compounds with a useful life greater than the ability of other tire structures to adhere," "the failure to incorporate into the design of the tire a nylon overbelt or cap or strip to inhibit belt/belt

---

[1] Plaintiff has also sued Ford; they are not parties in the instant dispute.

separations," and "the failure to use adequate amounts of anti-ozonants and anti-oxidants in the belt skin compound." Compl. ¶ 10.

Much of the present discovery dispute concerns the degree of similarity between the tire used on plaintiff's vehicle and other tires manufactured by Continental. One dimension of similarity or difference is tire size. The tire used on plaintiff's vehicle was a General Ameritrac SUV, sized P235/70R16 radial passenger tire. According to Continental, "The 'P' stands for passenger; '235' represents the width of the tire in millimeters; '70' is the ratio of height to width; 'R' means radial; '16' is the nominal rim diameter in inches." The sticker adhered to plaintiff's vehicle apparently indicated that "Standard Load" tires of this size were the only ones Ford approved for use on that vehicle model. Continental states that Ford approved two other tire sizes for other "trims" of 2002 Ford Explorers: sizes P245/70R16 and P255/70R16. Plaintiff contends that certain other Ford Explorers (apparently those produced in other model years) use tires with a 15" nominal rim diameter, as opposed to the 16" diameter used on plaintiff's vehicle.

Unsurprisingly, tires vary in many ways other than size. According to Continental, tires of a "common green" are those using the same cured tire standard and plant build specification, sharing the identical combination and placement of components and built in

////

////

3

the same way prior to being vulcanized in a press.[2] Continental represents that it manufactured approximately 269,000 tires "from the same specification" as the tire at issue here. Although sharing a common green, these tires included ten different models, bearing "a different name or design on the sidewall which occurs during the curing process." More broadly, Continental represents that it made tires P235/70R16 sized tires in "twenty-three separate tire specifications," amounting to "several millions of tires," in the last ten years. Joint Statement of March 3, 2010, at 2.

**B.   The Disputed Discovery**

On August 24, 2009, the magistrate judge entered a protective order governing discovery to be produced by Continental in this case. (Dkt. No. 39). Under this order, when Continental labels information as "confidential," then Plaintiff's counsel, experts, and staff cannot use the information for any purpose except their work on this case. "Confidential," as used by the order, is meant to refer to "information that is, contains, or reveals a trade secret or other designated confidential research, development, and other commercial information of [Continental]." Id. at 2.

The disputed discovery includes both written discovery (interrogatories and requests for production) and depositions under Fed. R. Civ. P. 30(b)(6). The written discovery was allegedly first served on August 11, 2009. Joint Statement at 2 (Dkt. No.

---

[2] Even tires of a common green may not be identical, however, as Continental states that "[r]evisions are made to the cured tire standards and plant build specification over time which would apply to the subject model tire as well as all of the common greens."

4

50). Continental responded by objecting to many of these requests. After several meet and confer sessions, two joint statements, and a prior hearing before the magistrate judge, the magistrate judge heard the motions to compel and for a protective order regarding the written discovery on March 18, 2010.

Continental objected to the written discovery primarily on two grounds. More generally, Continental argued that plaintiff sought information regarding other tire models without any showing that this information was relevant. As to a subset of the requests, Continental argued that they sought protected trade secrets without showing that this information was necessary to plaintiff's case. The magistrate judge's resolution of both objections is discussed in greater detail below. In general, as to the relevance objection, the magistrate judge held that plaintiff was entitled to discovery relating to tires with 15" and 16" nominal diameters and widths from 185 to 265 millimeters and manufactured from 2000 through 2009 (the "general scope" approved by the magistrate judge). As to the trade secrets objection, the magistrate judge limited the requests in a way that he held would not reveal trade secrets.

Limited to the general scope of tire sizes provided above, the magistrate judge ordered Continental to respond to interrogatories 3-5 and 8, and requests for production 18, 20, 21, 27-32, 34-41, 44-45, 54. Some of these requests concern the identification of tires constructed from similar materials or designs, but the majority concern identification of possible failures in other

5

tires.  The court quotes these requests here:

**3:**   Please identify the brand names of all tires produced by CTNA which utilized the same skim stock as the subject tire.

**4:**   Please identify the brand names of all [tires] which utilized the same wedge (gumstrip) or belt edge material as the subject tire.

**5:**   Please identify the brand names of all [tire] which utilized the same inner liner material as the subject tire.

**8:**   Please state whether CTNA, or any of its affiliated, successor, and/or predecessor corporations, have ever received a complaint of injury or death that allegedly occurred as a result of tread separation involving a [tire]. If the answer to the foregoing is "yes", as to each such complaint, please state:
a.  Name and address of attorney representing such individuals;
b.  Description of tire involved.

**18 & 20:** Any internal memos, meeting notes, reports, or studies relating to blistered liners, air pockets, or air bubbles in [tires] produced by CTNA at the Mount Vernon, Illinois plant [#18] [or] companywide [#20]

**21:**  Any and all documents, including electronic documents (e-mails), relating to any actual or potential recall and/or replacement program for any [tires]

**27:**  Copies of adjustment records for all [tires] with nylon overlays, cap plies, or nylon belt edge strips . . . .

**28:**  Copies of any and all adjustment records, accumulation of adjustment data, or analysis of adjustment data for tires designated as CTNA General Ameritrac SUV radial tires or any CTNA steel belted radial passenger or light truck tire with the same or similar skim stock . . . .

6

**29:**    Copies of any and all adjustment records, accumulation of adjustment data, or analysis of adjustment records for steel belted radial passenger and light truck tires produced by CTNA from 1998 through the present.

**30 & 31:** Any and all documents, including but not limited to, periodic reports, i.e., monthly, quarterly, semi-annual, etc., which reflect injuries, accidents, failures in service, malfunctions, or tread separations of [tires] produced by CTNA [#30] [or] produced by CTNA at its Mount Vernon, Illinois plant [#31].

**32:**    Any and all documents which reflect injuries, accidents, failures in service, or malfunctions of [tires] in which a tire suffered tread or tread belt separation and subsequent loss of control of the vehicle, including, but not limited to, complaints and accident reports.

**33:**    Adjustment records and adjustment records analysis for CTNA General Ameritrac SUV tires manufactured inside the United States.

**35:**    Provide any periodic reports, including but not limited to, monthly, quarterly, semi-annually, etc., of adjustment records or adjustment analysis provided to plant employees, plant chemists, management, or corporate headquarters from 1998 through the present.

**36 & 37:** Copies of all incident reports, claims reports, and/or or product liability reports, by whatever name, reflecting complaints of tread belt separation for CTNA General Ameritrac SUV steel-belted radial tires [#36] [or] General Ameritrac SUV steel-belted radial tires with the same or similar skim stocks [#37] . . . .

**38:**    Copies of all incident reports, claims reports, and/or or product liability reports, by whatever name, for all tires produced by CTNA with nylon overlays, cap

7

|   |   |   |
|---|---|---|
| 1 |  | plies, or nylon belt edge strips . . . . |
| 2 | **39:** | Any and all documents which reflect legal action brought against CTNA for alleged tread and/or belt separation failures of steel belted radial passenger or light truck tires from 1998 through the present. Please include the Complaint and all other documents reflecting the date the claim was made, the name of the plaintiffs or complaining party, the nature of the defect alleged, the place and date of manufacture of the tire, and, if a verdict or settlement was reached, the amount of the verdict or settlement. |
| 9 | **40:** | Copies of any and all complaints brought against CTNA for alleged tread separation and/or belt separation of radial steel belted passenger or light truck tires which resulted in personal injury or property damages from 1998 through the present. |
| 13 | **41:** | Copies of any and all complaints brought against CTNA for alleged tread separation and/or belt separation of passenger or light truck tires designated as CTNA General Ameritrac SUV radial tires or any CTNA steel belted radial passenger or light truck tire of similar "green tire" construction from 1998 through the present, which resulted in personal injury or property damages. |
| 18 | **44:** | Copies of air permeability testing data, specifications and standards for CTNA General Ameritrac SUV and tires with the same inner liner, or of inner liners or inner liner material prior to the date of manufacture of the subject tire. |
| 22 | **45:** | All video film and photographic depictions of vehicle stability testing performed on any light truck vehicle with CTNA General Ameritrac SUV tires and written documentation in reference thereto including, but not limited to, test protocols, test results and test evaluations. |

**54:** The results of road test belt edge and/or tread belt durability testing and analysis of the CTNA General Ameritrac SUV or similar tires.

In addition to these requests, the magistrate judge granted several other requests, but with a narrower scope:[3]

**6:** This interrogatory requested "the brand names of all tires produced by CTNA which utilized the same antioxidant package as the subject tire." The magistrate judge granted this request, but further reduced the general scope, directing Continental to identify only 16" nominal diameter tires (whereas the general scope included both 15" and 16" tires). Transcript at 50-59.

**12:** Interrogatory 12 asked "Was there any change in the level of antioxidants in CTNA General Ameritrac SUV tires produced in Mount Vernon, Illinois plant from 1998 through the present. And if so, explain all changes in detail." The magistrate judge ordered Continental to answer yes or no for all 16" tires otherwise within the general scope. Rather than explaining changes in detail, Continental was permitted to provide a simple summary of the reason for the change. Transcript at 59-62.

**23:** This document request asked, in essence, whether Continental used ground coal in tire manufacture. Plaintiff was directed to re-word and then re-serve this request. Transcript at 62-67.

**47:** "Copies of any and all depositions, including exhibits, of tire expert witnesses on behalf of CTNA from prior tread belt separation litigation involving the General Ameritrac SUV or similar tires since 2000." This request for production was also subject to the limited scope, including only 16" tires meeting the other general scope criteria.

---

[3] Above, the court merely quoted plaintiff's requests in full. For the following, the court paraphrases, quoting language as appropriate and where indicated.

9

Separate from the above written discovery, the motions to compel and for a protective order concerned numerous proposed depositions of corporate representatives under Fed. R. Civ. P. 30(b)(6). These depositions were noticed much later than the written discovery, in January of 2010. See Joint Statements Concerning Depositions (Dkt. Nos. 78, 81). The magistrate judge ordered Continental to respond to the following items subject to the Scope Limitations, but only after plaintiff had limited the scope of the information sought in additional ways (besides the Scope Limitations) specified by Continental: areas of inquiry numbers 4-6 and 10, areas of testimony numbers 1, 9-10 and 14, and request numbers 8-9 and 11. Transcript at 82-88, 92-93, 95, 105-106 and 108-110. He also ordered Continental to respond to areas of testimony number 12, 21-26, and 29, subject to the general or reduced scope limitations, but without prejudice to Continental's ability to renew its request for a Protective Order on privilege grounds, so long as Continental first supplied a privilege log. Transcript at 93-94, 96-101, 122-124. These requests were largely similar to the written discovery discussed above, and as such need not be repeated in full here.

**II. Standard for Review of Magistrate Judge's Discovery Orders**

Federal Rule of Civil Procedure 72(a) provides that non-dispositive pretrial matters may be decided by a magistrate judge, subject to reconsideration by the district judge. See also Local Rule 72-303(f). The district judge shall, upon reconsideration, modify or set aside any part of the magistrate judge's order which

is "found to be clearly erroneous or contrary to law." Id.; see also 28 USC § 636 (b)(1)(A).

Discovery motions are non-dispositive pretrial motions within the scope of Rule 72(a) and 28 USC § 636(b)(1)(A), and thus subject to the "clearly erroneous or contrary to law" standard of review. Rockwell Intern., Inc. v. Pos-A-Traction Industries, Inc., 712 F.2d 1324, 1325 (9th Cir. 1983)(per curium). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); Anti-Monopoly, Inc. v. General Mills Fun Group, Inc., 684 F.2d 1316, 1318 (9th Cir. 1982).

### III. Analysis

Continental raises three issues. First, Continental generally argues that the ordered discovery exceeds the scope of Fed. R. Civ. P. 26(b) by allowing discovery of products other than the tire specifically at issue without a showing that those products are substantially similar. Second, Continental argues that a subset of the ordered discovery contains trade secrets, that such discovery is only proper on plaintiff's showing that this information is necessary, but that no such showing has been made. Finally, Continental objects to the order to produce deposition transcripts from other, separate cases, for a variety of reasons.

**A. Scope of Discovery**

Continental argues that information regarding tires other than

the model at issue is not discoverable until plaintiff demonstrates that the other tires are "substantially similar."[4]

### 1.   "Substantial Similarity"

This proceeding is governed by the federal rules of evidence and civil procedure, notwithstanding the fact that plaintiff's claims arise under California law.  The only binding authority identified by the parties concerning substantial similarity in products liability actions concerns the *admissibility* of evidence. The Ninth Circuit has repeatedly held that "[a] 'showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect.' Minor or immaterial dissimilarity does not prevent admissibility." White v. Ford Motor Co., 312 F.3d 998, 1009 (9th Cir. 2002) (quoting Cooper v. Firestone Tire & Rubber Co., 945 F.2d 1103, 1105 (9th Cir. 1991) and citing Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc., 23 F.3d 1547, 1555 (9th Cir. 1994)).

In this case, the magistrate judge concluded that tire size was not the sole determinant of similarity. Plaintiff alleges that the tire's defects included:

---

[4] Plaintiff's opposition characterizes Continental as arguing that discovery should be limited to 16" tires.  Continental argues for much more (or less) than this: it wants discovery limited to the "common greens" for the tire used on plaintiff's car; failing that, discovery limited to size of tire that would actually fit on plaintiff's car, and failing that, discovery limited to tires that fit 2002 explorers.   Contrary to plaintiff's implication, Continental has not conceded that discovery regarding all 16" tires is proper.

>nylon edge strips that weren't properly fitted, insufficient adhesion between the rubber skim interfaces of the steel belts, issues about porosity, trapped air that's present, whether or not there were impressions on the belt skim wedge areas that indicate aged components have been utilized, whether or not open or cracked inner liner splices allowed for oxygen to get in. [¶] [and] . . . what antioxidants were used.

Transcript at 4. The magistrate judge held that at this stage, plaintiff was entitled to investigate whether tires were similar with respect to these traits despite being a different size than the allegedly defective tire. Id. ("So saying that a tire is of a particular size doesn't really speak to those, . . . given that the issue here is whether the inner liner, the steel belt skim stock, the wedges in these cap plies are somehow making a difference in terms of the steel oxidizing, or rusting, and ultimately the tire failing due to separat[ion] of the belts."). If products share the specific design features alleged to be defective, it may be that other differences between the products, such as tire size, are "immaterial." White, 312 F.3d at 1009 .

　　This case differs from White, Cooper, and Western Recreational Vehicles in at least two salient regards. One is that the Ninth Circuit cases concerned evidence *defects* in other products, which were held to be relevant only if the products were similar. Here, plaintiff seeks in part to discover whether the products are *dissimilar*, which may reveal that the other tires presented a superior, safer design that should have been used for the subject tire. Transcript at 7. The jury will need to determine whether

the disputed tire "is performing as good as other sets of tires, or much worse than other sets of tires, or even better than other sets of tires." Id. Of course, the safety of another tire will be relevant only if the other tire is similar enough to the one at issue that the two could have shared a common design. Nonetheless, the alternative theory of relevance recognized by the magistrate judge implicates a broader sense of similarity.

The second, and perhaps more important, distinction is that the above cases concerned admissibility, whereas evidence need not be admissible to be discoverable. Federal Rule of Civil Procedure 26(b)(1) provides in pertinent part that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

A court may limit discovery if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

14

Fed. R. Civ. P. 26(b)(2). Whether to limit discovery under these provisions is a further exercise of the court's discretion.

The distinction between admissibility at trial and discoverability is especially significant where, as here, a threshold question is factually intensive. Information necessary to determine whether products are similar will ordinarily be within the control of the manufacturer and/or designer. The rules cannot be read as imposing a "Catch-22" that would require proof of similarity before a party may discover evidence of similarity.

**2.   Other Cases Cited by Continental**

Notwithstanding the above, Continental cites several cases that limited discovery on the ground that products were not substantially similar, relying in particular on <u>Hofer v. Mack Trucks, Inc.</u>, 981 F.2d 377, 381 (8th Cir. 1992), <u>Barcenas v. Ford Motor Co.</u>, No. C 03-04644, 2004 WL 2827249, 2004 U.S. Dist. LEXIS 25279 (N.D. Cal. Dec. 9, 2004),[5] and <u>Piacenti v. General Motors Corp.</u>, 173 F.R.D. 221, 225 (N.D. Ill. 1997). After reviewing these three, the court concludes that the magistrate judge did not abuse his discretion by declining to follow these cases on the facts here.

<u>Hofer</u> concerned a rollover of a Mack truck. 981 F.3d at 380. Plaintiff requested for discovery regarding prior truck designs, which plaintiff contended were safer and that defendant had

---

[5] The court notes that <u>Barcenas</u>'s author, magistrate judge Edward A. Infante, explicitly designated his opinion in that case as "not for publication."

15

1  wrongfully departed from.  Id.  Thus, the factors distinguishing
2  the instant case from White--discovery as opposed to admissibility
3  and pertinence of dissimilarity as well as similarity--do not
4  distinguish the instant case from Hofer.  The district court denied
5  the Hofer plaintiff's motion to compel discovery.  Id.  The Eighth
6  Circuit noted that although there was  "no black letter rule of
7  law," "discovery of similar, if not identical, models is generally
8  permitted."  Id. at 380-81.  After surveying various examples,
9  Hofer held that courts should "undertake[] a fact specific
10 determination of the extent of the similarities or dissimilarities,
11 and . . . inquire[] about the basis for the discovery request."
12 Id. at 381.  Like White, Hofer recognized that the question was
13 whether the other models are similar in regards pertinent to the
14 issue or component being litigated.  Id.  In the case before it,
15 the court was "satisfied that the truck models F and W are
16 sufficiently dissimilar in design from the model MH that a
17 burdensome production of documents regarding the design minutiae
18 of those earlier models would not have yielded information which
19 would have supported Hofer's claim that the model MH truck cab was
20 defective."  Id.
21     Thus, in Hofer, an extensive factual record was available at
22 the time of the discover dispute.  Hofer therefore was not
23 confronted with the "cath-22" identified above, because the
24 plaintiff was not asked to prove similarity before seeking the
25 evidence he would need to do so.  As summarized by the Eighth
26 Circuit, the defendant in Hofer affirmatively demonstrated

16

dissimilarity, rather than merely seeking to rest on the allocation of burdens. In this case, Continental has not shown dissimilarity, nor has Continental shown that discovery had advanced to the point at which plaintiff could be expected to make a showing of similarity.

One possible solution to the problem of how to prove similarity would have been to allow discovery to proceed in phases, such that plaintiff could seek evidence to be used in making the similarity showing before seeking other information. "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, 8 Fed. Prac. & Proc. Civ. § 2008.1 (3d ed.) (quoting Crawford-El v. Britton, 523 U.S. 574, 598 (1998)). Of course, to recognize that the magistrate judge could have adopted this approach is not to hold that the approach was required. Moreover, while phased discovery has an appeal in the abstract, it is not clear how it would be implemented here. For example, plaintiff seeks information about tire construction and also about tire failures. The former indicates whether tires are similar in various regards. The latter, however, may indicate which regards are actually pertinent, by identifying those components that do and do not fail.

Accordingly, the magistrate judge did not abuse his discretion by declining to follow Hofer on the facts of this case. Barcenas and Piacenti involved facts similar to Hofer, and the court finds them distinguishable for the same reasons. In each, discovery had

17

progressed to the point where the defendant made a showing of dissimilarity, rather than merely arguing that the moving plaintiff had failed to meet his burden. Barcenas, 2004 U.S. Dist. LEXIS 25279, *22; Piacenti, 173 F.R.D. at 225. In this case, facts bearing on similarity have not yet been offered, and the magistrate's determination that the requested discovery would itself bear on similarity was not clearly erroneous or contrary to law.

In summary, the magistrate judge did not abuse his discretion by ordering discovery regarding tires other than the specific tire at issue without a more extensive showing of substantial similarity.

**B.   Trade Secrets**

Continental separately argues that even if the ordered discovery is within the scope of Rule 26(b)(1), some of the discovery seeks trade secrets. Trade secrets are be protected from discovery unless the party seeking disclosure establishes that "the trade secret sought is relevant and necessary to the prosecution or defense of the case." Hartley Pen Co. v. United States Dist. Court, 287 F.2d 324, 331 (9th Cir. 1961).

In this case, the magistrate judge explicitly found that plaintiff had not made a showing of necessity as to any of the requested discovery. The magistrate judge held that plaintiff's requests could be narrowed, however, so as to avoid implicating any trade secrets. For example, the magistrate judge concluded that the antioxidant formulas used by Continental were protected trade

18

secrets, but the dates of any changes in these formulas were not. Transcript at 12-13.

On Continental's motion for reconsideration, Continental bears the burden of establishing that the magistrate judge committed an abuse of discretion. Continental has argued that it closely guards its formulas, and cites numerous cases holding that formulas themselves are trade secrets. Continental has not meaningfully addressed, however, the magistrate judge's conclusion that the limited information encompassed by the order to compel does not rise to the level of a trade secret. Moreover, Continental bore the burden of demonstrating that this information constituted a trade secret before the magistrate judge. Accordingly, Continental's request for reconsideration is denied in this regard.

**C.  Prior Depositions**

The magistrate judge ordered Continental to produce transcripts of all depositions since 2000 of experts hired by Continental in any litigation concerning the belt tread separation for tires within the limited scope, i.e., 16" tires with widths from 185 to 265 millimeters. Transcript 67-76. Aside from Continental's general relevance argument discussed above, Continental argues that compulsion of these items was improper because these transcripts will be inadmissible at trial.

**IV. Conclusion**

For the reasons stated above, Continental's request for reconsideration (Dkt. No. 98) of the magistrate judge's order of March 18, 2010 (Dkt. No. 91) is DENIED. Continental SHALL produce

1  the ordered discovery within twenty-one (21) days of the date of
2  this order.  Plaintiff SHALL file a proposed modification of the
3  scheduling order within seven (7) days thereafter.
4       IT IS SO ORDERED.
5       DATED:  April 27, 2010.

/s/ Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT